# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| KELLY THOMPSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Docket No. 2:22-cv-00266-NT |
| | ) |
| MAINEHEALTH, | ) |
| | ) |
| Defendant. | ) |

## ORDER ON DEFENDANT'S PARTIAL MOTION TO DISMISS

Before me is the Defendant's motion to dismiss Counts I and II of the Plaintiff's Amended Complaint (ECF No. 6). For the reasons stated below, the motion is **DENIED.**

## FACTUAL BACKGROUND

The Defendant, MaineHealth, is a healthcare organization and the parent company of multiple healthcare provider entities in the state of Maine, including Pen Bay Medical Center ("**Pen Bay**") and Quarry Hill. Am. Compl. ¶¶ 4–5, 8 (ECF No. 1-9). The Plaintiff, Kelly Thompson, began working at Quarry Hill as a nursing assistant in 2004, and then, starting in 2008, worked at Pen Bay in a variety of positions, most recently as a Medical Assistant in Neurology. Am. Compl. ¶¶ 7–8. Thompson maintained her job at Quarry Hill on a per diem basis throughout her employment with MaineHealth. Am. Compl. ¶ 8.

Thompson's parents are both disabled. Am. Compl. ¶ 9. Thompson's mother has dementia, and, around September of 2020, Thompson's mother was diagnosed

with stomach cancer and her father suffered a stroke. Am. Compl. ¶¶ 13–14, 16. Because of family circumstances, Thompson is responsible for her mother's care and treatment decisions and had to provide care for her father after his stroke. Am. Compl. ¶¶ 14, 17–18. At that time, COVID-19 restrictions prohibited family members from attending appointments with patients, and thus Thompson often had to communicate with her parents' medical providers by phone. Am. Compl. ¶ 20. At some point, Thompson applied for and was approved to use intermittent leave pursuant to the Family Medical Leave Act ("**FMLA**") to care for her parents. Am. Compl. ¶ 19.

Thompson alleges that, after she began to use her FMLA leave, she started experiencing hostility at work. For example, when Thompson informed her supervisor, Martha Lutrell, of her family situation, Lutrell responded, "I don't have parents so I don't have to worry about that." Am. Compl. ¶ 21. In addition, Lutrell nitpicked Thompson's work performance, excluded Thompson from meetings, shared Thompson's personal information with Thompson's coworkers, and requested that Thompson's coworkers watch her. Am. Compl. ¶¶ 23–26. Lutrell disciplined Thompson for using her cell phone for personal matters during work hours, even though other employees, including Lutrell, routinely used their phones for personal matters during the day. Am. Compl. ¶¶ 32–34. On one occasion, Lutrell "made a dramatic scene in front of Thompson's coworkers and wrote her up" after Thompson spoke on the phone with one of her mother's physicians for ten to fifteen minutes. Am. Compl. ¶ 36. Other employees were not disciplined for using their cell phones for personal matters during working hours. Am. Compl. ¶ 32.

2

Thompson reported Lutrell's behavior to Lutrell's manager, Lynn Fowler. Am. Compl. ¶ 38. Fowler met with Thompson to discuss her complaint but insisted that Lutrell be present at the meeting. Am. Compl. ¶ 38. Then, Lutrell berated Thompson during the meeting. Am. Compl. ¶ 38.

According to the Plaintiff, conditions only worsened after the meeting with Fowler. Compl. ¶ 39. MaineHealth accused Thompson of failing to complete her COVID-19 screenings. Am. Compl. ¶ 44. The Plaintiff asserts, however, that she did complete her screenings for each shift, though the computer screening tool did not always respond and/or work properly. Am. Compl. ¶ 45. Other employees, including physicians, had similar issues with the system but were not disciplined because of it. Am. Compl. ¶ 47.

On December 10, 2020, MaineHealth terminated Thompson's employment at Pen Bay and Quarry Hill, claiming that she had failed to comply with COVID-19 screening policies and frequently used her cell phone for personal matters. Am. Compl. ¶¶ 50–51. The Plaintiff asserts that these reasons were merely a pretext, and that she was actually fired because she required FMLA leave and needed to attend to her disabled family members. Am. Compl. ¶ 55. Thompson alleges that Lutrell had already hired another person to replace Thompson weeks before she was fired. Am. Compl. ¶ 52.

On April 29, 2022, the Plaintiff filed a complaint in state court against her former employer, MaineHealth, alleging discrimination, retaliation, and interference under state and federal law. Compl. (ECF No. 1-3). The Plaintiff filed an Amended

Complaint on July 28, 2022. Am. Compl. (ECF No. 1-9). Defendant MaineHealth removed the case to federal court on August 26, 2022. Def.'s Notice of Removal (ECF No. 1). Now, the Defendant moves to dismiss Counts I and II of the Plaintiff's Amended Complaint. Def.'s Partial Mot. to Dismiss 1 (ECF No. 6).

## LEGAL STANDARD

The Defendant has moved to dismiss Counts I and II of the Plaintiff's Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Rule 12(b)(6) requires dismissal when a complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When evaluating a motion to dismiss, I take "as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor." *Alston v. Spiegel*, 988 F.3d 564, 571 (1st Cir. 2021) (quoting *Santiago v. Puerto Rico*, 655 F.3d 61, 72 (1st Cir. 2011)). "[A] complaint will survive a motion to dismiss when it alleges 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is "plausible" if the facts alleged give rise to a reasonable inference of liability. *Id.* "Plausible" means "more than merely possible." *Germanowski v. Harris*, 854 F.3d 68, 71 (1st Cir. 2017) (quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012)).

## DISCUSSION

The Defendant moves to dismiss Counts I and II of the Plaintiff's Amended Complaint, which assert disability discrimination and retaliation under the Maine Human Rights Act (the "**MHRA**"). *See* Am. Compl. ¶¶ 58–69. The Defendant argues

that the "Plaintiff's MHRA disability claim fails because she has not plead sufficient facts to demonstrate associational discrimination" and that her "MHRA retaliation claim fails because she has not plead sufficient facts to demonstrate that she engaged in protected activity under the MHRA." Def.'s Partial Mot. to Dismiss 1. Below I address each of these issues in turn.

## I. Disability Discrimination (Count I)

Count I of the Plaintiff's Amended Complaint asserts that Thompson was discriminated against on the basis of her association with her disabled parents in violation of the MHRA. Am. Compl. ¶ 62.

The MHRA forbids associational discrimination in employment, making it unlawful to "[e]xclud[e] or otherwise deny[ ] equal jobs or benefits to a qualified individual because of the known protected class status of an individual with whom the qualified individual is known to have a relationship or association[.]" 5 M.R.S. § 4553(2)(D).[1] To establish a prima facie case under the associational discrimination provision, a plaintiff must show:

---

[1] The federal Americans with Disabilities Act (the "**ADA**") contains a parallel associational discrimination provision. *See* 42 U.S.C. § 12112(b)(4). The Defendant asserts, without disagreement from the Plaintiff, that the analysis for associational discrimination under the Maine Human Rights Act (the "**MHRA**") tracks that for associational discrimination under the ADA. Def.'s Partial Mot. to Dismiss 4 n.3 (ECF No. 6). In general, courts analyzing the MHRA look to federal precedent on the ADA for guidance. *See Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 312 (1st Cir. 2003) ("It is settled law that the MHRA should be construed and applied along the same contours as the ADA."); *Soileau v. Guilford of Me., Inc.*, 105 F.3d 12, 14 (1st Cir. 1997) ("[I]nterpretation of the ADA and of the Maine Human Rights Act have proceeded hand in hand . . . ."); *Winston v. Me. Tech. Coll. Sys.*, 631 A.2d 70, 74 (Me. 1993) ("[B]ecause the MHRA generally tracks federal anti-discrimination statutes, it is appropriate to look to federal precedent for guidance in interpreting the MHRA."). While further briefing may complicate the relationship between the two statutes' associational discrimination provisions, for now, in the absence of any objection from the Plaintiff, I assume that federal precedent is instructive in my analysis here.

> (1) [that] she was qualified for the job at the time of the adverse employment action; (2) that she was subjected to adverse employment action; (3) that her employer knew, at the time of the adverse employment action, that she had a relative or associate with a disability; and (4) that the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision.

*Carey v. AB Car Rental Servs., Inc.*, No. 1:20-cv-00117-GZS, 2021 WL 431745, at *5 (D. Me. Feb. 8, 2021) (quoting *Leavitt v. SW & B Const. Co.*, 766 F. Supp. 2d 263, 280 (D. Me. 2011)).

The associational discrimination provision is "intended to protect qualified individuals from adverse job actions based on 'unfounded stereotypes and assumptions' arising from the employees' relationships with particular disabled persons." *Oliveras-Sifre v. P.R. Dep't of Health*, 214 F.3d 23, 26 (1st Cir. 2000) (quoting *Barker v. Int'l Paper Co.*, 993 F. Supp. 10, 15 (D. Me. 1998)). The interpretative guidelines put out by the Equal Employment Opportunity Commission ("**EEOC**") offer three examples of associational discrimination:

> (1) refusal to hire where the employer makes an unfounded assumption that the employee will miss work in order to care for a disabled relative; (2) discharging an employee who does volunteer work with AIDS victims, due to fear that the employee may contract the disease; and (3) denying health benefits to a disabled dependent of an employee but not to other dependents, even where the provision of benefits to the disabled dependent would result in increased health insurance costs for the employer.

*Id.* (quoting *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1084 n.6 (10th Cir. 1997)). A cognizable associational discrimination claim must "fit within this framework." *Id.*; *see also, e.g.*, *Leavitt*, 766 F. Supp. 2d at 283 (granting summary judgment for defendant on associational discrimination claim that did not resemble any of the

6

examples provided in the EEOC interpretive guidelines ); *Knight v. O'Reilly Auto Enters., LLC*, No. 2:17-cv-300-NT, 2019 WL 1302545, at *8 (D. Me. Mar. 21, 2019) (finding that an associational discrimination claim failed because the complaint did not allege "an unfounded stereotype or assumption about the Plaintiff or her children with disabilities").

Here, the Defendant attacks the Plaintiff's associational discrimination claim on the ground that Thompson has not plausibly alleged that her parents' disabilities were a "determining factor" in the alleged adverse employment actions. Def.'s Partial Mot. to Dismiss 5. Specifically, the Defendant argues that the Plaintiff has "fail[ed] to plausibly allege that MaineHealth's disciplinary action and Plaintiff's subsequent employment termination was due to any stereotypes or unfounded beliefs concerning the Plaintiff's association with her parents . . . ." Def.'s Partial Mot. to Dismiss 6. I disagree. The Plaintiff alleges a number of actions by her supervisor that, when viewed together and in the light most favorable to the Plaintiff, support an inference that Lutrell assumed that the Plaintiff would be distracted or unable to meet work demands because of her responsibilities toward her disabled parents.

Associational discrimination occurs when "the employer fears that the employee will be inattentive at work due to the disability of the disabled person." *Graziado v. Culinary Inst. of Am.*, 817 F.3d 415, 432 (2d Cir. 2016); *see also Aguirre v. Mayaguez Resort & Casino, Inc.*, 59 F. Supp. 3d 340, 349 (D.P.R. 2014) ("An employer's refusal to hire an otherwise qualified applicant or termination of an employee, based on a belief that the individual would be distracted or miss work to

7

care for a disabled relative, are examples of actionable conduct under the association provision."). Associational discrimination on this basis fits into the framework set out by the First Circuit in *Oliveras-Sifre*—indeed, it is the type of discriminatory conduct described in the first EEOC interpretive guideline example provided in that case. *See Oliveras-Sifre*, 214 F.3d at 26 (including as an example of associational discrimination "refusal to hire where the employer makes an unfounded assumption that the employee will miss work in order to care for a disabled relative").

In this case, the Plaintiff alleges that Lutrell was unsympathetic about the Plaintiff's personal circumstances and did not allow her to speak with her parents' physicians during working hours. Am. Compl. ¶¶ 21, 35. When it became clear that the Plaintiff had caretaking duties toward her disabled parents, Lutrell increased supervision of the Plaintiff by "nitpicking" her work performance, pulling information from her work history, and requesting that other employees "watch" the Plaintiff. Am. Compl. ¶¶ 23, 26, 31. Additionally, other employees who exhibited similar behavior as the Plaintiff—such as using their cell phones for personal matters during work and encountering issues with the COVID screening software—were not disciplined or subject to increased supervision; only the Plaintiff was. Am. Compl. ¶¶ 32–33; 47. The Plaintiff was also the only individual among her coworkers for whom it was not "optional" to work at the testing site with possible positive COVID-19 cases. Am. Compl. ¶ 28. Furthermore, Lutrell's decision to "exclude" the Plaintiff from employee meetings and the Plaintiff's belief that "Lutrell hired another [person] to replace" her support the idea that Lutrell did not believe that the Plaintiff would

8

remain an active member of the staff as a result of her need to care for her disabled parents. Am. Compl. ¶¶ 24, 52.

Of course, it is also possible that the adverse employment actions experienced by Thompson were motivated not by "unfounded stereotypes and assumptions," but rather by the conclusion that Thompson was *actually* distracted and/or unable to meet the job requirements. *See, e.g., Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 214 (4th Cir. 1994) (finding no associational discrimination where an employee with a disabled son was terminated, not because of an unfounded assumption about her likelihood of missing work because of him, but because she actually failed to meet the attendance requirements of the job and generated an extensive record of absences in connection with his care). More factual development is necessary to understand the precise circumstances surrounding Thompson's treatment by Luttrell and her termination. At this stage however, based on the facts alleged in the Amended Complaint, a reasonable inference can be drawn that Lutrell made an assumption about Thompson's ability to do her job based on her association with her disabled parents. As such, the motion to dismiss Count I of the Plaintiff's Amended Complaint is denied.[2]

---

[2] The Defendant also asserts that the Plaintiff bases her discrimination claim partly on the allegation that MaineHealth failed to provide her with a reasonable accommodation to take care of her disabled parents. *See* Def.'s Partial Mot. to Dismiss 7 (ECF No. 6). I do not see evidence in the Plaintiff's Amended Complaint or in her opposition brief that she intends to make such a claim and I therefore do not address the argument.

9

## II.     MHRA Retaliation (Count II)

Count II of the Plaintiff's Amended Complaint asserts retaliation in violation of the MHRA. Am. Compl. ¶¶ 64–69. The MHRA prohibits retaliation "against any individual because that individual has opposed any act or practice that is unlawful under this Act or because that individual made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this Act." 5 M.R.S. § 4633(1). "[A] plaintiff bringing a claim for retaliation under the MHRA 'must show that: (1) [s]he engaged in protected conduct under the statute; (2) [s]he suffered an adverse employment action; and (3) a causal connection existed between the protected conduct and the adverse action.' " *Hall v. President & Trs. of Bates Coll.*, 2:22-cv-00090-JAW, 2022 WL 17485903, at *21 (D. Me. Dec. 7, 2022) (quoting *Bishop v. Bell Atl. Corp.*, 299 F.3d 53, 58 (1st Cir. 2002)).

The Defendant seeks to dismiss the Plaintiff's MHRA retaliation claim on the ground that Thompson has failed to allege that she engaged in protected conduct. Def.'s Partial Mot. to Dismiss 8. Specifically, the Defendant points to the Plaintiff's assertion that she "engaged in protected activity by requesting accommodations to attend to her parents with disabilities." Am. Compl. ¶ 66. The Defendant argues that the Plaintiff failed to allege that she ever requested such accommodations and, even if she did, that such a request is not protected conduct. Def.'s Partial Mot. to Dismiss 9 & n.5. The Plaintiff does not respond to this argument and thus waives the issue. *See In re Compact Disc Minimum Price Antitrust Litig.*, 456 F. Supp. 2d 131, 152 (D. Me. 2006) ("A party's failure to oppose specific arguments in a motion to dismiss results in waiver of those issues.").

10

The Plaintiff does, however, raise an alternative theory—that she engaged in protected conduct when she "complained of the discrimination she perceived from her supervisor Lutrell to Lutrell and Lutrell's supervisor." Pl.'s Opp'n to Def[.'s] Rule 12(b)(6) Mot. to Dismiss 4 (ECF No. 7). Under Maine law, "[a] protected activity is broadly defined as conduct by the plaintiff that is in opposition to an unlawful employment practice of the defendant." *Curtis v. Sullivan Tire, Inc.*, 584 F. Supp. 2d 204, 212 (D. Me. 2008) (quoting *Bowen v. Dep't of Hum. Servs.*, 606 A.2d 1051, 1054 (Me. 1992)). As explained in the previous section, the Plaintiff has plausibly alleged that Lutrell discriminated against Thompson, including by nitpicking her work, excluding her from meetings, asking coworkers to watch her, disciplining her for certain conduct that others were not disciplined for, and requiring her to undertake work that was voluntary for everyone else. Am. Compl. ¶¶ 23–24, 26, 28, 32, 50. Moreover, the Plaintiff alleges that she complained about this discriminatory treatment to Lutrell and Lutrell's supervisor, Fowler. Am. Compl. ¶¶ 38–39.[3] In other words, the Plaintiff plausibly alleges that she engaged in protected conduct by opposing what she believed to be an unlawful employment practice.

The Defendant does not address the possibility that Thompson's complaints to Fowler and Lutrell constitute protected conduct. While further briefing may impact my understanding of this issue at a later date, I am satisfied that the allegations

---

[3] While these allegations are not raised specifically in the context of Thompson's retaliation claim, I consider them in my analysis because Count II includes standard language incorporating all of the allegations in the Amended Complaint. Am. Compl. ¶ 64.

11

contained in the Plaintiff's Amended Complaint are sufficient to allow the Plaintiff's retaliation claim to survive at this stage.

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Defendant's Partial Motion to Dismiss (ECF No. 6).

SO ORDERED.

> /s/ Nancy Torresen
> United States District Judge

Dated this 27th day of January, 2023.